# JOHN WILLIAMS, Assignee of FREDERICK C. LOMILENO, *vs.* CHEW SNEBLY, et al.

*Fraudulent Conveyances—Evidence—Rights of Creditors—Equity of Party Expending Money in Improvement of Property Fraudulently Conveyed—Estoppel of Party Having Knowledge of a Proceeding in rem.*

When the question is whether certain transfers of property were fraudulent as against the creditors of the grantor, or of the person with whose money the property was purchased, evidence is admissible of the acts and declarations of the parties made prior to, as well as contemporaneously with the transfers.

Upon a bill to vacate a conveyance of property because fraudulent, and to sell the same for the benefit of the creditors of the grantor, a person who claims an interest in the property by virtue of an unrecorded trust, and who has knowledge of the pendency of the proceedings, is bound by the decree as effectually as if made a party.

In 1884, the defendant S., against whom there existed an unsatisfied jugdment in the State of New York, purchased two adjoining houses in Balmore City and used them as a boarding and lodging-house, the business being conducted by him and by Jennie M., another defendant, his housekeeper. In 1889, S. conveyed the houses to his brother-in-law, a non-resident, who paid no consideration, and he in 1891 conveyed the houses to M. without consideration. In 1894 another adjoining house was purchased and conveyed directly to M., and was used in connection with the other two as a lodging-house. Plaintiff obtained a judgment in this State on the New York judgment against S., and filed a bill alleging that the deeds to M. were fraudulent as against the creditors of S., and that the above mentioned property, being in fact owned by S., was subject to the claims of plaintiff and other creditors. The defendants alleged that the conveyances of the first two houses to M. were made in consideration of a covenant by her to pay a sum of money alleged to be due by S. to his daughter as part of a trust fund held by him for her, and that the third house had been purchased with money belonging to M. *Held,*

1st. That the first two houses were purchased with money belonging to S.; that the said conveyances were designed to put the property beyond the reach of his creditors, and that this fraudulent purpose was known to the defendant, M.

2nd. That the alleged indebtedness of S. to his daughter, or a trust in her favor, is not established by the evidence.

3rd. That since the purchase-money of the third house and the sums expended in improving the other two houses were earned principally by the labor of M. in conducting the business, her equity is stronger than that of the creditors of S., who stood by without enforcing their claims.

4th. That a decree should be made directing the sale of the property, one-half of the proceeds of sale to be allowed to M., and the other half to be distributed among the creditors of S.

Appeal from a decree of the Circuit Court of Baltimore City (WICKES, J.), by which it was adjudged, that the property mentioned in these proceedings is owned by Jennie Myers and not liable for the debts of Chew Snebly; that said Jennie Myers pay into Court the sum of $4,000, to abide the determination of the Court as to the validity of the claim of Ray Miller, and that upon her failure to pay said sum into Court within three months, the houses Nos. 221 and 223 Courtland Street be sold, subject to the mortgages thereon.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD and SCHMUCKER, JJ.

*Alfred S. Niles* and *Oscar Wolff* (with whom were *Thomas Foley Hisky* and *Robert H. Carr, Jr.*, on the brief), for the appellants.

*John V. L. Findlay* and *James W. Denny* for the appellees.

SCHMUCKER, J., delivered the opinion of the Court:

The appellant, being the holder of a judgment for $31,209.43 against Chew Snebly, filed a creditor's bill against him and others in the Circuit Court of Baltimore City asking to have a building in that city known as the Hotel Baltimore, with its furniture and equipment, declared to be the property of Snebly and subjected to the payment of his debts. The bill as filed asked for similar relief as to certain leaseholds in other parts of the city, but the case was not pressed as to them.

The Hotel Baltimore is a four-story building, composed of three adjoining dwellings, formerly known as Nos. 221, 223

and 225 Courtland Street which, by means of various altera-
tions and additions have been converted into the present
structure. Nos. 223 and 221 were purchased by Snebly and
conveyed to him on May 29, 1884, and July 19, 1885 respec-
tively. He paid $750 in cash for each house and gave mort-
gages of $2,000 on one house and $3,000 on the other for
the balance of the purchase-money.

On January 27, 1889, Snebly conveyed the two houses,
subject to the mortgages, to one Matthew Swann for a pro-
fessed consideration of $13,000, and on April 24, 1891,
Swann conveyed them for the same professed consideration to
Jennie Myers. The deed to Swann did not disclose his resi-
dence, but the testimony shows that he lived on a farm in
Nebraska and was Snebly's brother-in-law. The third house,
No. 225 Courtland Street, was conveyed to Jennie Myers by
Mrs. Wm. S. Waters, its former owner, on January 24,
1894, for a consideration of $7,000, of which $5,000 were
paid by the check of Jennie Myers to the order of Snebly
and by him indorsed, and the remaining $2,000 were secured
by a purchase-money mortgage.

The alterations, by which the three dwellings were enlarged
and converted into the hotel, were made at different times and
were paid for, as was the furniture and equipment, mainly out
of the profits earned in conducting the hotel, although $2,000
of it seem to have been derived from the sale of an interest in
a fire extinguisher which Jennie Myers claims to have owned.
Snebly testified that a further $2,500 of the money spent for
the repairs and alterations consisted of proceeds of the sale in
1886 of real estate in New York belonging to his daughter
Ray, now Mrs. Miller.

The bill was filed by the appellant, after a *fi. fa.* on his
judgment had been returned *nulla bona,* on behalf of himself
and such other creditors as might come into the case, assert-
ing that the hotel and its contents were in fact the property of
Snebly, and that the conveyances by which the legal title
thereto was put into Jennie Myers were covinous and fraudu-
lent contrivances made or procured by Snebly for the purpose

of placing the property beyond the reach of his creditors. Certain other of Snebly's creditors, to whom he was indebted for materials purchased by him and used in the alterations ` to the hotel building, came into the suit as co-plaintiffs.

All of the defendants answered the bill under oath. Matthew Swann admitted the making of the deeds to and from him and that no actual consideration had been paid for either of them, and averred that he had no knowledge of or interest in the transactions, but had simply permitted the use of his name by Snebly in that connection at the request of the latter. He expressly disclaimed any fraudulent intent, but expressed his ignorance as to what may have been the purpose of Snebly in procuring the conveyances to be made.

Snebly in his answer denies the ownership of any interest in the hotel property or its contents, and insists that the conveyances by him to Swann and by Swann to Jennie Myers were in all respects *bona fide*. He admits that no money consideration passed in either case, but asserts that the real purpose of the two deeds was to protect his daughter, Ray Snebly, in reference to $4,000 of her money which he says were used by him in the purchase and repair of the Courtland street houses. In support of this allegation, he sets out two written agreements, professing to have been executed at the same time as the deeds. The first is a covenant from Matthew Swann which recites the conveyance of the houses to him, and that Snebly had invested $4,000 of Ray Snebly's money in their purchase and improvement, and then agrees to hold the houses "*for her use and benefit.*"

The second is a covenant from Jennie Myers containing like recitals and agreeing to hold the property to secure to Ray Snebly the repayment of the $4,000, and to pay to her that sum "*at the death of her father, Chew Snebly.*" The answer further asserts that Jennie Myers purchased the house No. 225 Courtland street and its contents, and made the alterations and repairs to it with her own money derived to the extent of $2,000 from the sale of an interest in a fire extinguisher, but mainly earned by her in conducting for her own account the

hotel which Snebly says she rented of him prior to her alleged purchase of it.

Jennie Myers in her answer gives substantially the same account as Snebly of the hotel enterprise, averring that after she had successfully conducted the boarding-house business as a tenant of Snebly she entered into negotiations with him for the purchase of the building, when she for the first time learned that it was owned by his brother-in-law Swann, and that she then concluded the transaction with Snebly as Swann's agent upon the terms which we have already mentioned in stating the contents of Snebly's answer.

Matthew Swann later on filed an unsworn amended answer, which Snebly signed as his counsel, in which he stated, as a result of his memory being refreshed, that the consideration for the deed to him and the one from him to Jennie Myers was the execution of the covenants already mentioned in connection with Snebly's answer.

Much testimony was taken, and after hearing the case the Circuit Court by its decree determined that the property in question belonged to Jennie Myers and not to Snebly and was not liable for his debts, but directed Jennie Myers within ninety days to pay into Court $4,000 to await the determination of the claim thereto of Snebly's daughter Ray, with the privilege to the latter to establish her claim by testimony before the auditor. Upon default of such payment into Court the decree directed the hotel to be sold and $4,000 of the proceeds to be paid into Court and the balance to be paid to Jennie Myers. On the day before the filing of the decree Ray Miller and her husband were, upon the petition of Jennie Myers, made parties to the suit with liberty to establish her claim to the $4,000 by testimony before the auditor.

The case presents issues of fact rather than of law. It is useless to cite authorities upon the proposition that conveyances made by, or by procurement of a debtor for the purpose of hindering, delaying or defrauding his creditors by placing his property beyond their reach will be avoided at the suit of the creditors if the grantee had knowledge of the purposes for

which the deeds were executed or sufficient notice of that purpose to put him upon inquiry in reference to it. Here, it is true, the conveyances were not made directly from Snebly to Jennie Myers, but the transmission to her through Swann of the title to Nos. 221 and 223 Courtland street was so plainly accomplished by the procurement of Snebly that it may, for the purposes of this case, be treated as a direct conveyance. The title to the third house was never in Snebly, but if he in fact supplied the consideration for its purchase and procured with her assent the conveyance to be made to her under the circumstances appearing from the record to protect the property from the claims of his creditors it would be chargeable in her hands with a resulting trust in their favor.

During the long period covered by the transactions involved in the inquiry before us, Snebly and Jennie Myers lived in the same house and occupied adjoining rooms. Their intercourse with each other was held directly and not through the channel of correspondence or the intervention of third persons. We are, therefore, deprived of the aid of direct testimony of disinterested witnesses as to what passed between them and must, as this Court said in the case of *Feigley* v. *Feigley*, 7 Md. 562, " look for the motives and designs of the parties in the surrounding circumstances attending the transaction and must call to our aid every fact, however remote and trivial it may be, which can throw light upon the subject." "And for this purpose not only are the acts and declarations of the parties made contemporaneous with the conveyances admissible but also such as are prior thereto provided they refer to and are connected with it." *Cooke* v. *Cooke*, 43 Md. 532.

In the voluminous record before us the testimony alone, exclusive of the exhibits and pleadings, covers 294 pages, so that we cannot review it at length or do more than state our conclusions and refer briefly to the facts upon which they rest.

The evidence satisfies us that the conveyances in question, so far as Snebly is concerned, were parts of a scheme devised by him to put the property out of the reach of his creditors.
. He was insolvent at the time he made the deed to Swann.

Although the suit of the appellant, on which the judgment against Snebly was rendered, had not yet been brought the indebtedness upon which it was founded had existed for some years in the form of a final judgment in the State of New York. He was of course aware of the existence of this foreign judgment, and as the judgment upon it in Maryland was entered in November, 1890, it is fair to assume that he knew in 1889, when he made the deed to Swann, that the appellant contemplated instituting suit against him in Maryland on the judgment. It is apparent from the sworn answer of Swann, who resided in Nebraska and was never in Maryland, that he simply lent the use of his name to Snebly and had no real interest in the transactions. Snebly admitted in his testimony that in December, 1890, just after the judgment was obtained against him, he assigned to his daughter Ray, a judgment against Benj. J. Worthington for $1,685, to protect her $4,000, and "to protect the claim against any attachment that might be issued" on the appellant's judgment. In 1893 he entered another judgment against Worthington and others to the use of his daughter Ray, and then as her attorney directed it to be entered to the use of Jennie Myers, and when asked why he did so, replied that the entry to Ray's use must have been to furnish her additional security for her $4,000, but he could not remember about the use to Miss Myers.

Ever since the purchase by Snebly in 1884, of the first of the houses composing the hotel, he has continued to live in the building and repeatedly acted and spoke of it as if he were its owner. The witness Hochheimer, who as late as 1898, conducted, as lessee, the dining-room of the hotel, testified that he had no dealing with Jennie Myers, but rented the room from Snebly, who asserted that he was the owner of the hotel and said that Miss Myers was his housekeeper. Wm. J. Lloyd, who conducted the dining-room for a few months about the year 1893, testified that he made his contract with Snebly, and had no dealings with any other person, although he said that as part of his agreement he furnished board to Mr. Snebly, Miss Jennie and servant. The witness Wood-

ley said that about two years ago Snebly applied to him to buy about 50,000 bricks on credit, representing that he was good for the price of the bricks as he owned the Hotel Baltimore. The witnesses Barton, Fahey, Heise, Breslin and Caskey all testified that during the past few years they had sold to Snebly materials for the repairs and improvements to the hotel, for all of which he made contracts in his own name and they never heard of Jennie Myers as owner or proprietor of the establishment. Snebly paid for some of these materials with his own note and suffered judgments to go against him in suits brought for the price of others of them. Several witnessess testified that Snebly had handed to them cards of the hotel on which his name appeared as proprietor. The impression produced upon the witnesses we have mentioned and upon others who had dealings with Snebly in connection with the hotel was that he, and he alone, was its proprietor. J. Seymour Waters, who acted as agent and attorney for his mother in making the sale of No. 225 Courtland street when it was conveyed to Jennie Myers, testified that Snebly had been in frequent and practically continuous negotiations for the property for eight or nine years prior to its sale, and that he never heard of Jennie Myers until after the sale had been effected, Snebly told him that she was the purchaser.

One Durant, who was the inventor and patentee of a fire extinguisher, became indebted to the hotel for board, and paid his debt by a transfer of an interest in the extinguisher patent. This interest was assigned by Durant to Jennie Myers and was afterwards sold by Snebly as her agent for $2,000, but Snebly in a letter written to Mr. Saunders, the counsel for the owner of the New York judgment against him, asserted that the interest in this extinguisher belonged to him and was very valuable.

Snebly's daughter, Ray Miller, who boarded with her father in the hotel for some years, when examined as a witness was asked in what capacity Jennie Myers was employed at the hotel and replied " I scarcely know that. I know she had charge of the house ; that is all I know ; " but it was

proven that a short time before when asked the same question in the presence of her counsel, Mrs. Miller had replied that "she (Jennie Myers), was some sort of a domestic."

Snebly kept a bank account in his own name, and Jennie Myers turned over to him the money earned in the hotel, of which entries were made in a book similar to a bank-book until an attachment on the appellant's judgment issued against Snebly and thereafter the bank account was kept in her name.

Against this array of testimony which certainly put the appellees under an obligation to make a full and candid disclosure of the true facts of the case, they produced but three witnesses other than themselves. Two of these witnesses were Taylor, who for some years had been room-clerk at the hotel, and a Frenchman named Le Mat, who had been living in the hotel "for nine years off and on." They both swore with much detail that Jennie Myers was the sole proprietor of the hotel, and had full supervision and management of it, and that she employed Snebly as her counsel and agent; that she always acted about the premises as their owner and that Snebly did not do so, but we think the preponderance of the testimony is against them. The third witness Plummer, had made a contract for tiling for part of the hotel with Jennie Myers, because his counsel discovered, upon an examination of the records, that the title to the property stood in her name.

Jennie Myers herself testified that when Snebly bought No. 223 Courtland street in 1884, she rented it of him upon terms that in lieu of rent she should pay the taxes, mortgage interest and water rent and board him and allow him to retain two offices free of rent, one of which he used as a bed room. That after he bought No. 221 in 1885, and improved and enlarged the two houses, she occupied both of them without any additional charge except that she then paid the taxes, water rent and mortgage interest on both houses, and that after all three of the houses had been conveyed to her and greatly enlarged and improved, Snebly continued to live with her in the same way without paying board or lodging.

She further testified that during all of this time she had con-
ducted a boarding and lodging-house or hotel in the building
and had employed Snebly as her counsel and agent, and that
she regarded his services in that connection as compensation
for his board and lodging.   When asked what business affairs
in particular he looked after she replied, " some money I had
to loan and did loan and in buying furniture and things for the
house."   She admitted that there was no difference in their
relations to each other in that respect between the time when
he owned the buildings and when she owned them.   She also
admitted that she paid no money consideration when the build-
ing was conveyed by Swann to her upon the professed con-
sideration of $13,000, but sets up as a consideration the exe-
cution by her of the covenant already mentioned to assume
the mortgage debt and pay Ray Miller $4,000 at her father's
death.

She insisted that she had conducted the boarding-house or
hotel business on her own account from the beginning in 1884,
and that Snebly never was its proprietor nor interested in it ;
nor was she ever his housekeeper or in his employ.

The testimony to which we have referred does not directly
convict Jennie Myers of a deliberate co-operation with Snebly
in his efforts to place his property beyond the reach of his
creditors nor does it bring home to her actual knowledge of
his purposes.   Yet in view of the long-continued and intimate
relation shown to have existed between them and of her own
admission that the arrangement with him as to his board and
lodging in the house with her had continued without change
during the whole time, whether he or she was the holder of
the legal title to the property, we have been forced to the con-
clusion that she had such notice of the true situation as to put
her upon inquiry.   His was the dominating mind throughout
their various transactions but she was too willing a participant
in them to permit her to hold title as against his creditors to
such portion of the property as she received from him without
valuable consideration.

She gave no consideration for the deed of the houses Nos.

221 and 223 Courtland street which Snebly procured Swann to make to her except the execution of the alleged covenant to pay Ray Snebly $4,000 at the death of her father. For reasons which we will hereafter state we do not think that the alleged trust claimed to have been created by that covenant is entitled to prevail against Snebly's creditors. The funds with which the house No. 225 was purchased from Mrs. Waters were the product of the joint labors of Snebly and Miss Myers and were not her separate property.

At the same time we are of opinion that to the extent that the property has been increased in value by the expenditure upon it of the fruits of the many years of industrious and skilful labor which the record plainly shows were contributed toward conducting the hotel by Jennie Myers, her equity is stronger than that of the appellant who during that time asserted no claim upon the property or took any steps to subject it to the payment of Snebly's debt to him. It is difficult to accurately estimate the relative value of the contributions made by Snebly and Miss Myers to building up the establishment as it now stands, but we think that the testimony bearing upon this subject contained in the record justifies the conclusion that she contributed quite as much as he to the success of the enterprise and is entitled to share equally with his creditors in the proceeds of its sale.

The evidence offered in support of the alleged trust of $4,000 in behalf of Snebly's daughter Ray, does not seem to us to be sufficient to establish it. The account given by Snebly of the origin of the fund is a very improbable one. He testified that his wife died about the year 1875 at his home in the State of New York, and that during her last illness she handed him $4,000 with the request that he use it for his life and hand it over at his death to their daughter Ray, but he was unable to tell from what source his wife got the money or whether it was all of the money she had when she died, although they had been married for twenty years. He says that he mingled the $4,000 with his own money and used it, but afterwards he had conveyed to his daughter two lots of ground

in the State of New York to secure to her in case of any accident the $4,000 so left to her.   He further says after he moved to Baltimore he invested $1,500 of the $4,000 in the purchase of the two Courtland street houses and that subsequently his daughter sold the New York lots for $2,350 which she handed to him and he applied it with her assent to making improvements on the Courtland street houses.   Hence it was, he says, that he conveyed that property to Swann for the purpose of securing the $4,000 to his daughter.

When Snebly was asked who made the conveyance of the two lots of land to his daughter, he replied that he could not remember anything about the particulars of the matter.   He was then shown a certified copy of a deed from his brother-in-law, Matthew Swann, to his daughter Ray, for the two lots in New York, and asked if that was not a copy of the deed by which he had procured the lots to be conveyed to his daughter.   After carefully reading the copy of the deed he again replied that he had no recollection of the matters in relation to the execution of that deed.

Now, it is to be observed, that neither the deed of the hotel property to Matthew Swann, nor the deed from him to Jennie Myers, contained any mention of or allusion to the trust in favor of Snebly's daughter which rests wholly upon the two alleged secret agreements produced in evidence.   These two agreements do not create the same trust.   The first one is a paper signed by Swann agreeing to hold the property for the *use and benefit of Ray Snebly without recognizing any interest in her father.*   If this trust attached to the property Swann could not have made a good title to it except upon the same trusts, but the second paper signed by Jennie Myers recites the terms of the first one, and then agrees that the property shall stand as a security for the payment of $4,000 to Ray Snebly *at her father's death.*   This last paper proceeds upon the theory that the ownership of the property by Jennie Myers, during Snebly's life at least, is the equivalent of the use of the $4,000 by him.

Again, although, both of the Swann deeds were attested,

acknowledged and recorded, neither of these secret agreements which profess to have been executed simultaneously with the deeds is even attested by a subscribing witness. Furthermore, although, since 1891, Snebly's daughter Ray has been a married woman living away from her father's home, the agreements which profess to create a trust in her favor were not set up or produced in evidence in this case out of her possession or by her, but out of the possession of Snebly and by him.

When the bill was filed there was nothing in the records to indicate that Snebly's daughter Ray had any interest in or made any claim upon the hotel property. The appellant was therefore under no obligation at that time to make her a party to the suit. The alleged secret trust agreements were set up as a defense to the suit by Snebly in his answer, but before the agreements had been produced in evidence, and their alleged existence thus supported by proof, his daughter Ray, now Mrs. Miller, had herself testified in the case, showing that she was well aware of its existence. Furthermore, the testimony discloses the fact that she then had knowledge of the alleged trust in her favor and that she had consulted counsel in reference to the suit, and that in the presence of her counsel she had permitted the appellant's counsel to ask her certain questions in reference to it. When she was upon the witness stand she did not mention or allude to any claim of hers upon the property, nor has she at any time in any manner, intervened in the suit or asked to be made a party thereto or set up any claim against the estate in controversy. Under these circumstances she falls within the operation of the principle repeatedly announced by this Court that persons who are directly interested in a suit and have knowledge of its pendency and refuse or neglect to appear and avail themselves of their rights are concluded by the proceedings as effectually as if they were named on the record. *Parr & Cockey* v. *State, use of Cockey*, 71 Md. 236; *Albert* v. *Hamilton*, 76 Md. 310, 311.

As Mrs. Miller will be bound by the decree in the case, it

was error in the Court below, on the eve of signing the final decree, to pass an order upon the application of Jennie Myers allowing Mrs. Miller to assert her claim before the auditor and making her a party to the case for that purpose.

The decree appealed from will be affirmed in so far as it directs a sale of the property, but reversed in so far as it directs the disposition to be made of the proceeds of sale, one-half of which should be allowed to Jennie Myers and the other half to the creditors of Chew Snebly who have come into the case or shall do so before the distribution is made.

> *Decree affirmed in part and reversed in part and remanded, costs to be paid by the appellee, Chew Snebly.*